United States District Court
Northern District of Illinois
Eastern Division

| | | |
|---|---|---|
| HARRISON SUTTON, | ) | |
| | ) | |
| Plaintiff, | ) | No. 03 C 7500 |
| | ) | |
| v. | ) | |
| | ) | |
| JO ANNE BARNHART, | ) | Magistrate Judge Arlander Keys |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDOM OPINION AND ORDER

Plaintiff, Harrison Sutton, moves this Court for Summary
Judgment pursuant to Rule 56(a) of the Federal Rules of Civil
Procedure, to reverse or remand the final decision of the
Commissioner of Social Security, denying his claim for Disability
Insurance Benefits ("DIB") and Supplemental Security Income
("SSI"). 42 U.S.C. §405(g) (2005). Defendant has filed a Cross-
Motion for Summary Judgment, asking this Court to affirm the
Commissioner's final decision. For the reasons set forth below,
Plaintiff's Motion for Summary Judgment is granted in part, and
denied in part, and the Commissioner's Motion for Summary
Judgment is denied.

### Procedural History

On October 20, 1998, Plaintiff filed an application for
Disability Insurance Benefits ("DIB"), claiming that he was
disabled due to bilateral tibial and fibula fractures. (R. at
53.) This initial claim was denied on January 13, 1999. (R. at

10.)  On February 1, 1999, Plaintiff filed a Request for Reconsideration, which was denied on June 23, 1999.  (R. at 59, 10.)

Plaintiff subsequently requested and received a hearing before Administrative Law Judge ("ALJ") Robert C. Asbille.  (R. at 63-65.)  At the hearing on February 14, 2000, Plaintiff and Medical Expert ("ME") Dr. William Newman testified.  (R. at 414-445.)  After obtaining additional medical evidence, the ALJ held a supplemental hearing on August 10, 2000.[1]  At this supplemental hearing, Plaintiff and Dr. Newman again testified, along with Vocational Expert ("VE") Meyer Klein.  (R. at 19-51.)

Following the supplemental hearing, the ALJ issued a decision finding Plaintiff disabled from October 18, 1998 through November 12, 1999.  (R. at 15.)  The ALJ further found that, since Plaintiff's disability ceased on November 13, 1999, his entitlement to benefits ended on January 31, 2000.  (R. at 16.)  Plaintiff then filed a Request for Review of Hearing Decision with the Social Security Administration Appeals Council ("Appeals Council").  (R. at 5.)  The Appeals Council denied this request on September 2, 2003.  (R. at 2.)  Upon rejection of his appeal, Plaintiff filed this present action on October 23, 2003.

_____
[1]  A supplemental hearing was necessary because medical evidence, including Plaintiff's x-rays, was missing from the record at the initial hearing.

## Factual Background

### I.   Testimony

At the February 14, 2000 hearing before ALJ Asbille,
Plaintiff and ME Dr. William Newman both testified. (R. at 417-
445.) A supplemental hearing was held on August 10, 2000, where
Plaintiff, ME Dr. Newman, and VE Meyer Kline each testified.  (R.
at 19-51.)

### A. Medical Expert Dr. William Newman's Testimony

The ME, Dr. William Newman, gave a brief summary of
Plaintiff's medical history.  Plaintiff sustained bilateral pylon
fractures when he fell from a ladder on October 18, 1998.[2]  (R.
at 437.)  He was not operated on right away, because he had
swelling fracture blisters, which were treated by elevating his
legs.  (R. at 437.)  One week later, the swelling apparently
subsided and Plaintiff underwent his first surgical procedure in
connection with his injury.  On October 23, 1998, doctors applied
external fixators to Plaintiff's legs.  (R. at 437.)  Plaintiff
underwent his second surgical procedure on November 5, 1998.
During surgery, Plaintiff's doctors adjusted the external
fixators and applied bilateral fibular plates to both legs.  (R.
at 438.)  In February 1999, doctors removed the external fixators
and applied short leg casts.  (R. at 438.)  It is unclear from

[2] The record is unclear as to whether Plaintiff fell from three,
four, or five stories.

3

the record when the casts were removed, (R. at 438), but doctors removed the bilateral hardware from Plaintiff's legs on November 9, 1999.

Dr. Newman then explained that Plaintiff likely wore braces to limit motion.[3] (R. at 439.) He noted, however, that the record was devoid of information regarding the degenerative changes, so he could not comment further. (R. at 439.)

According to the medical records, Plaintiff has been able to bear his full weight since April 1999. (R. at 438.) As of June 29, 1999, Plaintiff's fractures were healed, although he was experiencing mild to moderate pain. (R. at 439.) The same report also noted some degenerative changes. (R. at 439.)

The ALJ then asked Dr. Newman if Plaintiff's condition met any of the Listings; Dr. Newman responded that he did not. (R. at 440-41.) Dr. Newman explained, however, that Plaintiff does have degenerative changes, so he would be limited to sedentary work. (R. at 441.) The ALJ next asked how long Plaintiff would be able to stand before he needed to sit down. Dr. Newman said that he would need to review the x-rays of Plaintiff's feet and ankles before he could make that assessment, noting that there was no evidence of Plaintiff's ankles swelling in the medical records. (R. at 441-42.) Finally, the ALJ asked if Plaintiff

---

[3] It is unclear from the record if these braces are the same as the short leg casts that doctors applied in February of 1999.

4

would require restrictions regarding being in extreme temperatures, and Dr. Newman replied that he would not. (R. at 443.) Dr. Newman testified that Plaintiff is limited to a full range of sedentary work, but cautioned that his assessment could change after he viewed x-rays, which apparently existed, but were not made a part of the record. (R. at 443.)

On August 10, 2000, a supplemental hearing was held, because medical evidence, including Plaintiff's x-rays, was missing from the record at the initial hearing. The purpose of this hearing was to obtain Dr. Newman's opinion of the new evidence. At the supplemental hearing, Dr. Newman testified that the x-ray reports do not describe the condition of Plaintiff's ankle joints. However, Dr. Newman concluded that Plaintiff does have posttraumatic arthritis in both ankles. (R. at 33-34.) Dr. Newman asked Plaintiff why he needs to wear air casts. (R. at 34.) Plaintiff responded that he needs the air casts for support and to prevent swelling, but Dr. Newman did not think Plaintiff needed them. (R. at 34-35.)

The ALJ then asked Dr. Newman to describe what air casts do. (R. at 38.) Dr. Newman explained that they immobilize the ankle, which could control the pain, and they control swelling. (R. at 38.) He also indicated that air casts are awkward to wear, and that elastic stockings can achieve similar results. (R. at 38.) Dr. Newman further stated that the record shows that Plaintiff

5

can walk steadily with a cane, and was shown how to go up and down stairs. (R. at 39.) He felt that Plaintiff would be able to do sedentary work and would not need to elevate his legs throughout the day. (R. at 39-40.)

Plaintiff's attorney then questioned Dr. Newman about Plaintiff's need to elevate his legs. (R. at 40-44.) Dr. Newman testified that Plaintiff might need to elevate his feet if his legs become swollen, but only periodically. (R. at 40.) Dr. Newman then stated that, while Plaintiff has been diagnosed with plantar fasciitis and a stocking loss of sensation bilaterally, the record does not show any evidence of nerve damage. (R. at 41-42.) Dr. Newman stated that, in his opinion, Plaintiff was disabled through the time he had the hardware removed, which was November 12, 1999. (R. at 44.)

## B. Plaintiff's Testimony

At the February 14, 2000 hearing, Plaintiff testified that he currently lives with his two young children. He explained that his mother and other family members help him care for the children. (R. at 418-19.) He claimed that he cannot walk without a cane, and has difficulty navigating stairs. (R. at 418-19.) He further testified that he was currently experiencing stomach pain, caused by ibuprofen, and leg pain. (R. at 419-420.)

6

The ALJ then questioned Plaintiff about his work history. (R. at 420-424.) Plaintiff testified that, while in the Marines, his specialty was motor transport. (R. at 420.) He later graduated from the Washburn Trade School, after which he worked as an apprentice plasterer. (R. at 420-21.) He previously worked as a shipping and receiving clerk at Wal-Mart, a construction worker, a laborer in a manufacturing company, a housekeeper at a motel, a messenger for a printing company, and an airplane fuel agent (R. at 421-23.) Plaintiff is not currently employed, and has not worked since October 1998. (R. at 420).

Plaintiff testified that he hurt himself after falling from approximately three stories off of a ladder, and subsequently had five surgeries related to his injuries.[4] (R. at 424.) He stated that he visits the VA hospital at least once a month, and has seen many different doctors. (R. at 425.) Plaintiff continues to experience pain in his feet and ankles, which causes him to have trouble sleeping. (R. at 425-26.) He is taking Elavil to help him sleep, but feels he has become immune to it and needs something stronger. (R. at 426.) As a result, he often sleeps during the day. (R. at 426-27.)

---

[4] The medical records indicate Plaintiff only had four surgeries.

7

Plaintiff was then asked to describe a typical day. (R. at 427). Plaintiff testified that he usually does not leave his apartment, and that his sisters and nephews help him with cooking and cleaning. (R. at 427.) He keeps his feet elevated and wraps them to keep them warm. (R. at 427.)

The ALJ then asked Plaintiff a series of questions regarding the activities he is able to perform. (R. at 428-29.) Plaintiff testified he is not able to lift a gallon of milk because of the pressure it puts on his legs. (R. at 428.) He cannot sit for a long period of time without elevating his feet, or his legs hurt and throb. (R. at 428.) Plaintiff then stated that he has poor circulation in his legs, which has gotten worse since his accident. (R. at 429.) He said he cannot drive a car, because he cannot work the pedals and because he needs to keep his feet elevated. (R. at 429.) Plaintiff then described other problems he experiences, including decreased appetite and bowel problems. (R. at 430.)

Plaintiff's attorney then questioned him. (R. at 430-35.) Plaintiff stated that all of his doctors told him that he needs to elevate his feet. (R. at 430.) He then testified that he had surgery on November 12, 1999, where he had hardware removed. (R. at 430.) He said that one of his doctors recommended that he have additional surgery on his feet, but he did not want to have any more surgical procedures. (R. at 431.)

8

The attorney then asked Plaintiff whether he experiences any side effects from his medication. (R. at 431.) He responded that he suffers from stomach pain, bowel problems, and pain. (R. at 431.) He testified that he is only able to walk about fifteen or twenty feet with his cane before he needs to stop. (R. at 432.) He further testified that damp weather worsens his pain, and that his feet sometimes get very hot for extended periods of time. (R. at 432-33.) These problems affect his ability to concentrate. (R. at 433.) The attorney then asked about the Elavil Plaintiff is taking, and Plaintiff stated he takes more than directed, because the prescribed amount no longer has any effect on him. (R. at 433.)

Plaintiff then stated that his feet and ankles are very stiff when he first wakes up, and that it is midday before he can flex them. (R. at 433-34.) He testified that, although his doctors told him that the surgery to remove the hardware would likely reduce his pain, it has not done so. (R. at 434.) Plaintiff further stated that he only goes outside to go to the doctor or to see his attorney. (R. at 434-35.)

Dr. Newman then asked Plaintiff a series of questions. (R. at 436-37.) Plaintiff testified that, although his doctors had removed all metal from his ankles, they continue to swell. (R. at 436.) Plaintiff explained that he wears braces and air casts to keep his ankles straight. (R. at 436.) Plaintiff then stated

9

that, while the x-rays show his fractures healing, he has not felt an improvement.  (R. at 437.)

At the supplemental hearing, Plaintiff confirmed this testimony.  (R. at 20-28.)  He testified that he is easily thrown off balance.  (R. at 27.)  The ALJ then questioned Plaintiff about his use of a cane and the need to elevate his feet.  (R. at 28.)  Plaintiff stated that, if he does not elevate his feet, they start to hurt, and that they were hurting at the hearing.  (R. at 28.)

At the supplemental hearing on August 10, 2000, Dr. Newman again commented on Plaintiff's rather sparse medical records. Dr. Newman first noted that there is no operative report or progress notes for Plaintiff's hardware removal surgery on November 12, 1999 in the record, and that there was little evidence that Plaintiff had received treatment after June 1999.[5] (R. at 29-30.)  Plaintiff responded that he had been to the doctor approximately three times since November 1999. (R. at 31.) There was some confusion as to which doctors Plaintiff had seen. (R. at 31-32.)  Dr. Newman then asked Plaintiff about his use of air casts on his ankles, and Plaintiff stated he feels much better when he wears them.  (R. at 35-36.)  Dr. Newman asked

---

[5] While Dr. Newman is correct that there is no operative report in the record, there is a notation from Plaintiff's chart that he underwent the procedure.  (R. at 333.)  There are also notations that indicated Plaintiff saw a doctor after November 1999.  (R. at 323.)

10

Plaintiff what was wrong with his feet, and Plaintiff stated he has bone chips in both feet. (R. at 36.) Dr. Newman responded that the x-rays do not show bone chips. (R. at 36-37.) The ALJ then asked Plaintiff's attorney to forward additional information regarding why Plaintiff wears the air casts, which the attorney later did.[6] (R. at 37.)

## C. Vocational Expert Meyer Kline's Testimony

At the supplemental hearing, the ALJ first asked the VE, Meyer Kline,[7] to summarize Plaintiff's work history, describing the exertional level associated with each of Plaintiff's prior posisions. (R. at 46.) The VE described Plaintiff's apprentice work as semi-skilled activity with an exertional level of medium to heavy; Plaintiff's labor construction work as medium to heavy unskilled work; Plaintiff's hotel housekeeping work as medium unskilled work; and Plaintiff's messenger work as light unskilled work. (R. at 46.) Finally, the VE described Plaintiff's work fueling planes as medium unskilled. (R. at 46.)

The ALJ proceeded to ask the VE a series of hypothetical questions. (R. at 47-50.) First, the ALJ asked whether a person

---

[6] Plaintiff's attorney sent the ALJ a letter and a response from Plaintiff's doctor on March 30, 2000. (R. at 362-363.)

[7] From the record, it appears the VE only testified at the supplemental hearing. However, the end of the transcript from the February 14, 2000 hearing is missing from the record. The Court requested the missing pages, but the parties were unable to locate them.

11

of Plaintiff's age, education, and work experience, "who was able to do any level of exertional or nonexertional work, with the exception that he can do sedentary work limited to occasional postural movements, and has severe restrictions regarding the use of foot pedals, extreme temperatures, and moist environments, would be able to return to any of Plaintiff's past work." (R. at 47.) The VE testified that the person would not be able to return to Plaintiff's previous work, as none of that work was sedentary. (R. at 47.)

The ALJ then asked if there were other jobs Plaintiff could perform, with the residual functional capacity ("RFC") described above. (R. at 47.) The VE opined that Plaintiff would be able to perform unskilled, sedentary work, including surveillance monitoring, factory assembly work, and packing work. (R. at 47-48.) The VE estimated that there are approximately 1,400 surveillance jobs, 3,000 assembly jobs, and 1,500 packing jobs in the Chicago area. (R. at 48.)

The ALJ then posed a second hypothetical, adding the requirement that the person be permitted to prop his feet on a chair once an hour. (R. at 48.) The VE opined that this would require a special arrangement on an individual basis, and that most unskilled work does not allow for such options. (R. at 49.) He felt there would be far fewer jobs available if this was the case. (R. at 49.) The ALJ then added the requirement that the

12

person would need to keep his legs elevated all day long. (R. at 49.) The VE said there were not many available jobs that would accommodate this restriction.[8] (R. at 49).

Plaintiff's attorney then added a series of additional limitations to the ALJ's hypothetical. (R. at 50-51.) First, the attorney proposed a limitation that the hypothetical person had to lie down as necessary during the work day. (R. at 50.) The VE testified this would prevent the person from sustaining sedentary work. (R. at 50.) The attorney then asked a series of questions about the person's ability to concentrate as a result of pain. (R. at 50-51.) The VE agreed that, if a person was not able to concentrate for twenty-five percent of the day, he would not be productive enough to hold a job. (R. at 51.)

## II. Medical Evaluations

### A. Mount Sinai Hospital Medical Center (134-160)

Plaintiff was admitted to the Mt. Sinai emergency room after falling off a ladder on October 18, 1998. He was diagnosed with gross deformity of both ankles, with lateral displacement at the ankle joints. (R. at 140.) His ankles were relocated, and molds were placed on both ankles. (R. at 136-37.) On October 19, 1998, Plaintiff was transferred to Westside V.A. Hospital. (R. at 143.)

---

[8] The ALJ then asked Plaintiff's attorney about Plaintiff's potential mental impairments, but the attorney declined to pursue the matter. (R. at 49-50.)

13

## B. VA Hospital

### 1. Plaintiff's Surgery on October 23, 1998

On October 23, 1998, Dr. Dennis Mess performed surgery to treat Plaintiff's ankle dislocation. Bilateral external fixators were placed on each ankle to correct the fractured tibia and fibula. Further surgical proceedings could not be performed at this time, because Plaintiff had several fractural blisters. X-rays from November 1, 1998 show that there was no evidence that Plaintiff's fractures were healing.

### 2. Plaintiff's Surgery on November 5, 1998

Drs. T. Huang and Matthew Kopplin performed Plaintiff's next surgery on November 5, 1998. During this procedure, the bilateral external fixators were adjusted and bilateral fibular plates were applied. Prior to this, Plaintiff was informed that his fractures were severe, and that he was likely to have post-traumatic arthritis in both ankles, despite optimal treatment. There were no complications from this surgery.

On November 7, 1998, Plaintiff was discharged. He was instructed not to bear any weight, and was wheelchair bound. On that date, the doctor noted tenderness and swelling of both ankles. On November 9, 1998, Plaintiff was instructed to keep his legs elevated. Plaintiff next visited the doctor on January 20, 1999, and the progress notes state he was still in a wheelchair and had pins in his legs.

14

Progress notes from February 10, 1999 indicate that Plaintiff's pain had increased and he was taking Motrin and using marijuana to relieve the pain.

### 3. Plaintiff's Surgery on February 19, 1999

Dr. Dennis Mess performed another operation on Plaintiff on February 19, 1999. Prior to this surgery, Plaintiff had undergone therapy for progressive partial weight-bearing. X-rays showed evidence of the fracture healing, and Dr. Mess decided to go ahead with this procedure. During this surgery, both external fixators were removed and short leg casts were placed on each leg. The short leg casts allowed for further healing of the fractures. Again, there were no complications.

The record indicates that Plaintiff's casts were removed on February 23, 1999. At Plaintiff's hearing, however, Dr. Newman stated this date must be incorrect, since it was only four days after the surgery.

In April 1999, Plaintiff visited the doctor several times. Progress notes from April 23 and 27, 1999, indicate that Plaintiff's fractures were closed. He then underwent a physical performance test and gait training therapy. The report from April 27, 1999 indicates that Plaintiff was able to walk only one-half block before his ankles swelled. He also took very small steps and had minimal ankle dorsiflexion. The doctor encouraged Plaintiff to walk more. Progress notes from April 28,

15

1999 show that Plaintiff was ambulating with a slow, deliberate gait, and was steady on his feet. He was given a home program of exercises to increase his functional range of motion in his feet and ankles. Plaintiff was also shown how to navigate stairs, using his cane and the railing, and he expressed confidence about his ability to do this.

Plaintiff visited the doctor again on June 29, 1999. The doctor noted that Plaintiff's wounds and fractures had healed well, and ordered braces for Plaintiff.

## 4. Plaintiff's Surgery on November 12, 1999

On November 12, 1999, Plaintiff underwent a procedure to have his bilateral ankle hardware removed. Two plates and thirteen screws were removed from Plaintiff's ankles. After this surgery, Plaintiff was prescribed codeine/acetaminophen for pain.

Progress notes from January 31, 2000 state that Plaintiff was experiencing knee, ankle, foot, and leg pain. He was also prescribed amitriptyline for insomnia. Furthermore, x-rays from March 6, 2000 indicate that Plaintiff has flatfoot deformities.

## C. Medical Opinion of Non-Treating, Non-Examining Physician Mohammed Irshad

On October 18, 1999, medical consultant Dr. Mohammed Irshad reviewed Plaintiff's medical records, in order to determine his RFC. Dr. Irshad determined that, while strenuous climbing would

16

be unsafe for Plaintiff, he would be able to sit, stand, or walk for six hours out of an eight hour workday.

## D. Status Report from Examining Physician Dr. Leonard Smith

On March 16, 2000, Dr. Leonard Smith provided adjudicator Robert Kilby with a report of Plaintiff's status. He indicated that Plaintiff was capable of standing for only two hours out of an eight hour workday, but his ability to sit for eight hours was not affected. Other limitations on Plaintiff's ability to work included no climbing, no exposure to extreme temperatures, and no exposure to humidity and wetness.

## E. Clarification from one of Plaintiff's Doctors

At the initial hearing on February 14, 2000, Dr. Newman questioned why the record did not disclose evidence of a foot impairment or explain why air casts were ordered for Plaintiff. Plaintiff's attorney requested an explanation from the VA hospital. A doctor from the VA hospital responded in writing that, the shoe inserts were prescribed to treat Plaintiff's plantar fasciitis and the air casts were prescribed to provide support.

## III. The August 21, 2000 Decision of ALJ Asbille

On August 21, 2000, the ALJ issued his decision, finding that Plaintiff was disabled from October 18, 1998 through

November 12, 1999,[9] but not thereafter. (R. at 11.) Plaintiff
was, therefore, entitled to DIB from October 18, 1998 through
January 31, 2000. (R. at 16.) The ALJ reviewed all of the
medical evidence in the record, and also considered the testimony
of Plaintiff, the ME, and the VE in making this decision. (R. at
11-14.)

The ALJ acknowledged that Plaintiff's bilateral fractures
are considered a severe impairment. However, the ALJ concluded
that Plaintiff did not meet the criteria of Listing 1.11 or 1.13
in Appendix 1, Subpart P, Regulations No. 4, because Plaintiff
was able to walk with a cane as of June of 1999. (R. at 11.)
Because Plaintiff did not meet a Listing, the ALJ then had to
determine if Plaintiff had the RFC to perform his past work or
any other work in the national economy. (R. at 11.) The ALJ
found that, between October 18, 1998 and November 12, 1999,
Plaintiff was unable to perform even sedentary work, because he
did not meet the standing and walking requirements. (R. at 11.)
Plaintiff could bear weight by June of 1999, and the ALJ agreed
with Dr. Newman's testimony that Plaintiff would not be able to
return to sedentary work for a few more months after that. (R.
at 12.) The ALJ determined, however, that once doctors removed
the hardware from Plaintiff's ankles in November of 1999,

---

[9] On November 12, 1999, Plaintiff underwent surgery where the
hardware was removed from both his ankles.

Plaintiff would have been able to return to work. (R. at 12.) Because of this, the ALJ rejected the RFC from the State agency medical consultant and the consultant's conclusion that as of October 18, 1999, Plaintiff would be able to work six hour days. (R. at 12.)

Instead, the ALJ concluded that, by November 13, 1999, Plaintiff regained the capacity to perform sedentary work, because the hardware had been removed from his ankles. (R. at 11.) The ALJ noted that the medical evidence from this time period is sparse, but that it shows that Plaintiff had bilateral post-traumatic degenerative joint disease in both ankles and bilateral plantar fasciitis. (R. at 12.) These ailments were treated with therapy, air casts, and arch supports. (R. at 12.)

The ALJ acknowledged that Plaintiff's counsel had submitted a written report from a VA hospital doctor that advised Plaintiff to elevate his feet as needed during this time. (R. at 12.) At the hearing, however, Dr. Newman testified that he found no reasonable explanation for Plaintiff's claim that he needs to elevate his legs throughout the day. (R. at 12.) The ALJ concurred with Dr. Newman that Plaintiff has no need to elevate his legs frequently. (R. at 13.) Dr. Newman also did not find any medical evidence that Plaintiff has plantar fasciitis; he disagreed with written reports from two doctors that diagnosed Plaintiff with this. (R. at 13.) The ALJ noted that, even if

19

Plaintiff did suffer from plantar fasciitis, it would not prevent Plaintiff from performing a wide range of sedentary work. (R. at 13.)

The ALJ concluded that, by November 13, 1999, Plaintiff had regained the RFC to perform sedentary work, with some limitations. (R. at 13.) Plaintiff is unable to operate foot controls or climb, and should avoid temperature extremes and working at heights or around machinery. (R. at 13.) While Plaintiff is unable to perform his past relevant work, he has regained the ability to perform a wide range of sedentary work. (R. at 13-14.) The ALJ relied on the VE's testimony to determine that a significant number of jobs existed in the national economy, which Plaintiff is capable of performing. (R. at 14.)

In reaching this decision, the ALJ considered Plaintiff's testimony regarding his functional limitations, but did not find this testimony credible, purportedly because the medical evidence does not support it. (R. at 13.) Further influencing his decision was the fact that Plaintiff was not taking any narcotic pain medication and did not appear to be in pain at either hearing. This was in marked contrast to Plaintiff's claim that he was in near constant pain -- which even further reduced Plaintiff's credibility. (R. at 13.)

The ALJ ultimately concluded that Plaintiff was disabled from October 18, 1998 through November 12, 1999. However,

Plaintiff was not disabled as of November 13, 1999, because, by that time, Plaintiff was able to walk on his own with a cane. (R. at 11-12.)

## Discussion

### I. Standard of Review

In reviewing the ALJ's decision, the Court must review the entire record, but may not decide the facts, reweigh the evidence, or substitute its own judgment for that of the ALJ. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). However, the Court also must not merely rubber stamp the ALJ's decision. *Ehrhart v. Sec'y of Health and Human Servs.*, 969 F.2d 534, 538 (7th Cir. 1992) (noting that the ALJ is not entitled to unlimited judicial deference).

The Court must determine whether the Commissioner's final decision is supported by substantial evidence and is based upon proper legal criteria. *Ehrhart*, 969 F.2d at 538. The ALJ must consider all relevant evidence, not just evidence that favors his ultimate decision. *Herron*, 19 F.3d at 333. The ALJ must explain the legitimate reasons supporting his conclusion, and must build an "accurate and logical bridge" from the evidence to his conclusion. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

While Plaintiff bears the burden of demonstrating his disability, the ALJ must "develop a full and fair record".

21

*Thompson v. Sullivan*, 933 F.2d 581, 585 (7th Cir. 1991) (quoting *Smith v. Sec'y of HEW*, 587 F.2d 857, 860 (7th Cir. 1978)). The ALJ's failure to fulfill this duty is "good cause to remand for gathering additional evidence". *Id.* at 586.

## II. Social Security Regulations

The Social Security Regulations prescribe a sequential five-part test to determine a claimant's disability status. *See* 20 C.F.R. §§ 404.1520 and 416.920 (2001). The ALJ must consider: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude gainful activity; (4) whether the claimant is unable to perform his past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. *See* 20 C.F.R. §§ 404.1520 and 416.920. A finding of disability requires an affirmative answer at either step 3 or step 5. A negative answer at any step (other than step 3) precludes a finding of disability. *Young v. Sec'y of Health and Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). The claimant bears the burden of proof at steps 1-4, but the burden shifts to the Commissioner at step 5. *Id.*

## III. Analysis of the Arguments

Plaintiff contends that the ALJ erred in concluding that he was not disabled after November 12, 1999. Plaintiff argues that the ALJ's decision should be reversed or remanded, because: (1) the Appeals Council erred as a matter of law by denying Plaintiff's request for review; (2) the ALJ did not give controlling weight to the treating physician's opinions; and (3) the ALJ's determination of Plaintiff's credibility did not follow the requirements of SSR96-7p. The Court will discuss each argument in turn.

### A. The Appeals Council

Plaintiff first argues that the Appeals Council erred as a matter of law when it denied Plaintiff's request for review. Plaintiff notes that, *after* the ALJ issued his decision, but *before* the Appeals Council issued its denial, Listing 1.02(A) became effective,[10] replacing Listings 1.11 and 1.13 – the Listings upon which the ALJ relied. Plaintiff further argues that had the Appeals Council applied Listing 1.02(A), it would

---

[10] The ALJ issued his decision on August 21, 2000. The new Listings went into effect on February 19, 2002. The Appeals Council denied Plaintiff's request for review in September 2003 – nineteen months after new Listing 1.02(A) went into effect. Since the new regulations were in effect by the time the Appeals Council issued its decision, the Appeals Council was required to use the new regulations. *Greer v. Barnhart*, 201 F. Supp. 2d 897, 903 (N.D. Ill. 2002).

23

have concluded that the ALJ's decision is contrary to law and that Plaintiff's claim for disability should be granted.

The first issue the Court must resolve in determining whether the Appeals Council erred is whether the Appeals Council should have applied Listing 1.02(A) to Plaintiff's claim. The Court readily concludes that the new Listing applied. "The Commissioner's final rules make clear the revised musculoskeletal listing [applies] to claims pending at the administrative level on or after the effective date." *Greer v. Barnhart*, 201 F. Supp. 2d 897, 903 (N.D. Ill. 2002). The ALJ issued his decision on August 21, 2000, well before the new listings went into effect on February 19, 2002. Therefore, the ALJ obviously was correct in applying old Listings 1.11 and 1.13.

However, the Appeals Council did not issue its decision denying Plaintiff's request for review until September 2003, which was a full nineteen months after the new Listings had been in effect. Therefore, pursuant to the Commissioner's interpretation of its own regulations, the Court finds that the Appeals Council should have applied new Listing 1.02(A) to Plaintiff's claim. *Barnhart v. Walton*, 535 U.S. 212 (2002).

Next, the Court must determine whether the Appeals Council applied Listing 1.02(A). The Commissioner makes a weak argument

that the new Listing was applied,[11] pointing to a canned, conclusory assertion within the Appeals Council's decision, which states that its decision was made in accordance with all applicable laws and regulations. The recitation that all applicable laws and regulations were followed is far from persuasive, when application of the new Listing 1.02(A) in this case clearly undermines the foundation of the ALJ's decision, and arguably supports Plaintiff's claim of disability. *See generally Keys v. Barnhart*, 2002 WL 31369793 (N.D. Ill.), *aff'd*, 347 F.3d 990 (7th Cir. 2003) (stating that a de novo standard of review is used when determining if the Appeals Council committed an error of law).

The critical difference between Listing 1.02(A) and its predecessors, is that Listing 1.02(A) does not set a time limit for restoration of a major function or return to full weight-bearing status. Listing 1.02(A) requires, in relevant part that:

Major dysfunction of a joint(s) (due to any cause): Characterized by anatomical deformity (e.g…, sublixation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with

---

[11] The Commissioner begins by dodging the question altogether. First, the Commissioner argues that the *ALJ* reasonably found Plaintiff did not meet the prior Listings, which Plaintiff did not dispute. Plaintiff argued that the *Appeals Council* erred as a matter of law by not using the new Listings. The Commissioner briefly acknowledges the correct argument when she argues that it is clear the Appeals Council applied the new Listings, because the Appeals Council's form letter states it "applied the laws, regulations, and rulings in effect as of the date we took this action."

25

signs of limitations of motion or other abnormal motion
of the affected joint(s), and findings on appropriate
medically acceptable imaging of joint space narrowing,
bony destruction, or ankylosis of the affected joint(s)
with:

IV. Involvement of one major peripheral weight-bearing
joint (i.e., hip, knee, or ankle), resulting in
inability to ambulate effectively, as defined in
1.00(B)(2)(b);

20 C.F.R. Pt. 404, Subpt. P, Appendix 1, Rule 1.02.

Plaintiff argues that the Appeals Council erred when it
found the new regulations did not provide a basis for changing
the ALJ's decision, because Plaintiff now meets Listing 1.02(A).
The medical evidence shows that, after November 13, 1999,
Plaintiff still suffered from bilateral post-traumatic
degenerative joint disease in both ankles and bilateral plantar
fasciitis. (R. at 363.) In a letter dated March 16, 2000, one
of Plaintiff's doctors, Dr. Smith, notes that Plaintiff
complained of chronic pain, difficulty sleeping, and difficulty
standing for long periods of time. (R. at 364.) Dr. Smith also
noted that x-rays of Plaintiff's right ankle on March 16, 2000
show fractures of the distal tibia and fibula, bony synostosis of
the fibula and tibia, and some post-traumatic degenerative
changes.

In addition, the ALJ's decision denying Plaintiff's claim
hinged on the fact that Plaintiff could walk with a cane. The
new Listing reduced the persuasiveness of this factor. Unlike

Listings 1.11- 1.13, Listing 1.02(A) is met if the claimant is
unable to ambulate effectively on a sustained basis. This means
that a claimant who is not able to sustain a reasonable walking
pace that allows him to carry out daily living activities, walk a
block over uneven terrain, use standard public transportation,
carry out routine ambulatory activities, such as shopping and
banking, meets the Listing. *See* 20 C.F.R., Part 404, Subpt. P,
App. 1, 1.00 (b)(2). Therefore, if the Appeals Council had
applied Listing 1.02(A), it could have concluded that the ALJ's
decision was not consistent with applicable laws, because the
basis for the ALJ's decision - ie. Plaintiff's ability to
ambulate with a cane precluded him from meeting a Listing - had
been superceded. Therefore, the Appeals Council erred when it
denied Plaintiff's request for review.

**B. Controlling Weight of the Treating Physician's Opinion**

Plaintiff next argues that the ALJ did not give controlling
weight to his treating physician's opinion. The medical records
show that, shortly after his surgery, one of Plaintiff's treating
doctors, whose name appears to be Dr. Marcurial,[12] advised him to
elevate his feet as needed.[13] Dr. Newman, the ME, disagreed with
Dr. Marcurial's recommendation and opined, without fully

[12] The name on the note is illegible, but the ALJ found it to be
Dr. Marcurial

[13] This note from Dr. Marcurial is not dated, but the letter from
Plaintiff's attorney that accompanied it is dated March 30, 2000.

27

explaining, that Plaintiff did not need to elevate his feet. The ALJ ultimately agreed with Dr. Newman's opinion that Plaintiff did not need to elevate his feet.

Plaintiff argues that the ALJ is obligated to explain in his opinion why he refused to give controlling weight to the opinion of a treating physician. Plaintiff further contends that the ALJ should have weighed Dr. Marcurial's opinion against the opinion of Dr. Newman by analyzing the factors set forth in 20 C.F.R. Sec. 404.1527(d).[14]

The Social Security Regulations state that, generally, a treating physician's opinion is given greater weight than a non-treating physician's opinion. However, if the ALJ does not give controlling weight to the treating source's opinion, the ALJ must explain why he did not give it such weight, and apply the listed factors. 20 C.F.R. Sec. 404.1527 (d)(2)(i).

An ALJ can disregard a treating physician's medical opinion, if that opinion is not consistent with other medical evidence in the record, but he must explain why he did so. If the treating physician's opinion is supported by the medical evidence and is

[14] The factors for determining what weight to give the opinion are: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability of the opinion; (4) consistency of the opinion with the record as a whole; and (5) the specialization of the treating source.

28

consistent with other substantial evidence in the record, it is entitled to controlling weight.

In this case, it is not clear that Plaintiff even had a treating physician. The Commissioner notes that Plaintiff had four surgeries on his ankles at the VA hospital, which were performed by at least three different doctors. There is no evidence in the record that indicates he ever saw one physician on more than one occasion -- let alone regularly. In his opinion, the ALJ noted that, while there are three medical assessments in the record, there is not one from a treating medical source. The Plaintiff himself expressed confusion over which doctors he had seen and which doctors had performed his surgeries, and could not even recall his treating physician's name. (R. at 31-32.)

More importantly, even if the Court could conclude that one of the many doctors that Plaintiff saw was his treating physician, the Court is not persuaded that the ALJ erred. The Court notes that Dr. Newman's opinion that Plaintiff did not currently need to elevate his feet is not necessarily inconsistent with Dr. Marcurial's report. A review of Dr. Marcurial's recommendation does not indicate whether Dr. Marcurial advised Plaintiff to elevate his legs only in the short term, following his surgery, or whether Dr. Marcurial's advice applied to the long term. Because Dr. Marcurial's

recommendation was undated, it is unclear at what point during Plaintiff's recovery he gave this advice.

As such, the Court cannot readily conclude that the ALJ rejected Dr. Marcurial's opinion, and it is unclear if he gave it controlling weight. The ALJ merely states that Dr. Marcurial's opinion is incomplete, and then uses other medical opinions to come to his conclusion. Moreover, Dr. Marcurial's opinion is not consistent with other evidence in the record, since other evidence shows Plaintiff does not need to elevate his feet, including the opinion of the ME, Dr. Newman, who found that there was no medical evidence in the record supporting the recommendation that Plaintiff elevate his legs.

Furthermore, while the Social Security Regulations require more weight to be given to a treating physician's opinion, they also state that the reason they do so is because such a source is more likely to be able to provide a "detailed, longitudinal picture" of a claimant's medical impairments. 20 C.F.R. 404.1527 (d)(2). The Seventh Circuit has stated that it would be "exceedingly illogical to credit a doctor's opinion because he is *more likely* to have a detailed and longitudinal view of the claimant's impairments when *in fact, there is no detail or longitudinal view.*" *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) (holding the ALJ's assignment of little weight to a letter from a doctor was proper since it provided no detail or

longitudinal view). Here, Dr. Marcurial, who may or may not have actually treated Plaintiff, provided one undated note advising Plaintiff to elevate his legs. This note does not provide a longitudinal view of Plaintiff's medical impairments, since it is very brief and since it is unclear when, in relation to Plaintiff's surgeries, this advice was given.

For these reasons, the Court cannot find that the ALJ erred by failing to assign controlling weight to Dr. Marcurial's opinion.

## C. Plaintiff's Credibility

Finally, Plaintiff argues that the ALJ erred when he found Plaintiff's testimony not credible because the ALJ did not follow the requirements of SSR 96-7p. The Commissioner argues that the ALJ's credibility finding is entitled to substantial deference, and should not be disturbed unless it is patently wrong. The Commissioner contends that the ALJ reasonably concluded that Plaintiff's complaints of pain were not credible, because: 1) Plaintiff's complaints were not consistent with the medical evidence; 2) Plaintiff was not taking narcotic pain medication; and 3) Plaintiff did not appear to be in pain at the hearing.

Generally, the ALJ's credibility determination will not be overturned unless it is patently wrong. *Zurawski v. Halter*, 245 F.3d 881, 887 (2001); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). When determining an applicant's credibility

31

regarding pain, the ALJ must follow the two-step process set forth in SSR 96-7p. The ALJ's credibility determination must contain specific reasons for finding a claimant incredible that are supported by the evidence. *Zurawski v. Halter*, 245 F.3d 881, 887 (2001). A conclusory statement that Plaintiff's allegations are not credible is not sufficient. *Id.*

Plaintiff notes that, while he was not taking narcotic pain medication at the time of the hearing, he was taking significant amounts of Ibuprofen, and argues that the ALJ's rejection of this evidence indicates that the ALJ was playing doctor, including that the amount of Ibuprofen would not be sufficient to treat a patient in significant pain. Moreover, if the ALJ had doubts about the credibility of Plaintiff's complaints of pain, he had the duty to obtain a detailed description of Plaintiff's daily activities to determine whether the pain was debilitating.

A review of the ALJ's decision reveals that the ALJ did list reasons for concluding that Plaintiff was not wholly credible. However, the Court directs the ALJ, upon remand, to more closely comport with his obligations under SSR 96-7p.

## Conclusion

For the reasons set forth above, the Court finds that the Appeals Council erred when it failed to review Plaintiff's claim under Listing 1.02(A). However, the Commissioner -- not the Court --should determine whether Plaintiff satisfies all of the

requirements of this new listing. Therefore, Plaintiff's case is remanded, and the Court directs the Commissioner to analyze Plaintiff's claim in accordance with Listing 1.02(A). Accordingly, the Court grants Plaintiff's Motion for Summary Judgment, and denies the Commissioner's Motion for Summary Judgment. This matter is remanded.

Dated: May 3, 2005

E N T E R:

_Arlander Keys_

ARLANDER KEYS
United States Magistrate Judge